UNITED STATES *v.* GENERAL SHIPPING & TRADING Co., FELIX LORENZONI (No. 4880)[1]

---

[1] C. A. D. 656.

United States Court of Customs and Patent Appeals, May 7, 1957

*George Cochran Doub*, Assistant Attorney General and *Richard E. FitzGibbon*, Chief, Customs Section for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for appellee.

[Oral argument December 5, 1956, by Mr. FitzGibbon and Mr. Schwartz]

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, one judge dissenting, C. D. 1769, sustaining the importer's protest and holding certain merchandise properly classifiable under paragraph 232 (b) of the Tariff Act of 1930, as modified by T. D. 52476, rather than under paragraph 232 (d) of that Act, as modified by T. D. 51802, the classification made by the Collector of Customs. The pertinent portions of that paragraph, as modified, read:

| Tariff Act of 1930 paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 232(b) | Slabs and paving tiles of marble, breccia, or onyx; containing not less than four superficial inches: * * * If polished in whole or in part (whether or not rubbed): If not more than one inch in thickness__ | 7¢ per superficial ft. |
| 232(d) | Marble, breccia, and onyx, wholly or partly manufactured into monuments, benches, vases, and other articles, and articles of which these substances or any of them is the component material of chief value, not specially provided for_____ | 25% ad val. |

The merchandise consists of pieces of marble, approximately three feet long, eighteen inches wide, and seven-eighths of an inch thick, polished on one surface, with holes partly drilled in the top edge of each piece to receive clamping devices for holding them in place. The pieces are numbered to facilitate installation to follow the vein of the marble.

As correctly stated by the Customs Court, "The issue in this case is whether certain pieces of marble, imported to be used in the decoration of a church, were, in their imported condition, merely material, namely, slabs of marble to be made into a wainscot, or whether [as contended by the Government] they were collectively a manufactured article, to wit, a wainscot, in knocked-down condition."

According to the testimony of the importer, the marble was intended to be used as a wainscot in a church, and was ordered to specifications obtained by measuring the space to be covered and determining the necessary number of blocks of specified sizes. That determination involved allowance for the turns and corners but it was still necessary, in placing the marble in its final position, to cut the corner pieces to fit. To provide for loss in cutting on the job, about ten percent more marble was ordered than was theoretically necessary, and what remained after installation was left at the building to care for possible future repairs.

While the intention of the importer and the use to which the merchandise was actually put may properly be considered in deciding the above question, they are not, alone, determinative of it. As was said in *Worthington* v. *Robbins*, 139 U. S. 337,

* * * In order to produce uniformity in the imposition of duties, the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported. In order to be dutiable as "watch materials," the article, when imported, must be in such form of manufacture as to show its adaptation to the making of watches.

* * * In order to be "watch materials," the article must in itself bear marks of its special adaptation for use in making watches. The fact that the *article* in question *was used in the manufacture of watches has no relation to the condition of the article as imported,* but to what afterwards the importer did with it. (Italics added.)

It did not appear to the majority of the Customs Court, nor does it appear to us, that the evidence establishes that the instant merchandise was in such form, when imported, as to show its "special adaptation," in the sense in which we think the Supreme Court in *Worthington* v. *Robbins*, cited above, used the term, to use in a particular wainscot, or even to wainscotting in general. It consisted of slabs of marble which, according to the testimony, could be used "any place" including use for floors. The record indicates that the pieces were numbered "just to follow up the vein of the marble * * *

all the veining of the marble is supposed to match;" but it seems to us that result would be desirable wherever the slabs were used.

In the dissenting opinions both here and below, it is stated that "The fundamental tariff principle, applicable herein, is that the classification of imported merchandise is controlled by its condition at the time of importation." We agree with that statement. Our conflicting views do not stem from that principle, but to its application. That, in turn, primarily depends on the interpretation placed on the evidence.

It is a rare occasion indeed when an appeal involving the classification of imports is completely free of doubt. This is no exception. Here, however, there can be no doubt that the merchandise was originally slabs of marble. Therefore, the issue is simply whether, *at the time of importation,* it had been sufficiently advanced in condition as to be partly manufactured into wainscotting. The following excerpts from the testimony of the importer's witness, Moreno Tedeschi, are material to that issue:

Q. Did you place the order for this particular importation?
A. Yes.
Q. In placing the order, did you give the specifications to which the slabs should be cut?
A. No. Generally speaking, you tell them so many slabs of marble of this size.

\* \* \* \* \* \* \*

Q. Did you measure the building to give the exact size of the slabs?
A. Yes, but they never comply for some reason or other.

\* \* \* \* \* \* \*

Q. Where do you drill the holes?
A. On top and on the bottom.
Q. The top and bottom side?
A. Yes.
Q. Do the slabs as imported contain holes?
A. They may contain holes on top but not on the bottom.
Q. They never come containing holes on the bottom?
A. No.

\* \* \* \* \* \* \*

Q. Can you use the holes on the top edge as such in the condition as imported?
A. No, they are never deep enough. They are never adjusted to the conditions on the wall.
Q. In placing these slabs, the 5½ inch slabs to the wall, did you have to do any cutting on this job?
A. Yes.

\* \* \* \* \* \* \*

Q. In ordering your slabs do you allow for such cutting?
A. We do. We generally import 10 percent more material than we need.

\* \* \* \* \* \* \*

RQ. A wainscotting is a part of a wall of a building?
A. Yes. That particular marble can be used any place.

R.Q. The marble slabs that were imported here that you saw could have been used for something else? * * *

The Witness: They could be used any other place.

By Mr. Glad:

R.Q. Could they be used for something else other than wainscotting?
A. Of course. They can be used for floors. When the marble comes here, it can be sold for any other item.

Chief Judge Oliver: It could be resold for another purpose?
The Witness: That is right.

We think the above testimony fairly establishes that the merchandise, as imported, consisted merely of a collection of marble slabs, having holes partly drilled in one edge, and which had to be deepened, and new holes drilled, if the slabs were to be used in or as wainscotting. The quantity of marble in the slabs was in excess of that needed for the particular use to which they were to be put, and the testimony shows that the slabs were not restricted or dedicated to use only in wainscotting.

While Tedeschi testified that the slabs remaining after installation was completed were left on the job for possible future repairs and were not sold, the reason given for such procedure was "It is not enough to throw it back on the market." From that statement we think it reasonable to assume that such material was not inherently valueless and unmarketable, but that the quantity was too small to justify an attempt to sell it.

We are of the opinion that the merchandise, as imported, was merely marble slabs which, although ordered in particular sizes with a particular purpose in view, were still adapted for general use as slabs. Accordingly, they were not limited to use in wainscotting, as contended by the Government, since they could be used in a wainscot only by additional cutting, drilling, and shaping, with a portion of the marble left after those operations were completed.

Webster's New International Dictionary defines "knock-down" as "Made or constructed so as to be capable of being knocked down or taken apart, as for transportation," which clearly suggests that all parts are in final form, and that it is only necessary to assemble them in order to produce a completed article. That interpretation is supported by the decision in *United States* v. *McBride Studios*, 14 Ct. Cust. Appls. 321, T. D. 41956, in which it was stated:

* * * In order to constitute a knocked-down article its parts when assembled must make an entirety, an article ready for use. A knocked-down tile floor, if there be such a thing, is, therefore, a floor the component tiles of which are cut to shape and size for a particular floor and create a complete floor when put in place. * * *

It does not appear proper, in view of the foregoing, to hold that material which is ten per cent in excess of theoretical requirements,

which still must be cut and drilled on the job, and some of which is not actually used, constitutes a knock-down article.

A situation generally similar to that here was presented in *Thompson-Starrett Co.* v. *United States*, 12 Ct. Cust. Appls. 37, T. D. 39979, which involved marble tiles ordered from stock in accordance with blue prints for installation in particular floors conformably with the plans shown in such prints. The tiles were purchased in quantities, shapes, sizes, and colors corresponding to the requirements of the floors in which they were to be laid, and it does not appear that any reshaping of them on the job was necessary. It was held that the tiles were dutiable as paving tiles rather than as marble partly manufactured into articles.

The tiles in the above case were ordered from stock while the marble pieces here were cut to specified sizes, but that distinction is not, in our opinion, controlling. In the *McBride Studios* case the reasoning of the *Thompson-Starrett Co.* case was applied to tiles which had been cut to size, and the court said "As was well said by Justice McClelland, 'a tile is no more a tile because it is kept in stock and no less a tile because it is made to order.'" The quoted language seems equally applicable to slabs. Similarly, in *Mutual Lamp Mfg. Co.* v. *United States*, 21 C. C. P. A. (Customs) 231, T. D. 46762, it was held that certain flat pieces of onyx were classifiable not as onyx wholly or partly manufactured into articles, but as slabs, even though they were ordered in specific sizes and, in the condition imported, were each intended for use as definite parts of different articles.

The fact that marble slabs are not ordered from stock but are cut to specification might be important if their shape were of such a nature as to render them useless for any purpose other than the specific one for which they were cut. But where, as here, the pieces are cut to rectangular form and the evidence shows that they have general utility, they cannot properly be considered to be marble wholly or partly manufactured into an article. The fact that the dealer from whom the slabs are purchased does not carry in stock rectangular pieces of the particular dimensions desired should not be controlling on the question of classification.

The brief for the Government relies on the decisions in *U. Luisi & Co.* v. *United States*, T. D. 49180, 72 Treas. Dec. 362, and *Kronfeld, Saunders & Co.* v. *United States*, T. D. 26366, 9 Treas. Dec. 849. Those cases, however, are distinguishable from the instant one in that the pieces of marble involved were not only cut to specification but were apparently of such a nature that it was only necessary to assemble them in order to produce the finished articles of which they were parts.

The decision of the United States Customs Court is *affirmed*.

JACKSON, J., Retired, recalled to participate herein in place of COLE, J., absent because of illness.

---

JOHNSON, Chief Judge, dissenting.

I agree with the dissenting opinion of Chief Judge Oliver of the United States Customs Court which is as follows:

I am constrained to dissent from the position taken herein by my colleagues

I do not accept the theory of classifying this merchandise which the majority opinion develops according to an "objective" standard of use, as opposed to a "subjective" dedication to use. The reasoning is novel, and I find no rule of construction in support thereof. The fundamental tariff principle, applicable herein, is that the classification of imported merchandise is controlled by its condition at the time of importation. *United States* v. *Citroen,* 223 U. S. 407; *Dwight* v. *Merritt,* 140 U. S. 213.

The record herein is conclusive to the effect that the marble in question was ordered according to specifications, in certain predetermined sizes, for a definite use as wainscotting in a particular building; that, at the time of importation, each piece had anchor holes drilled at the top and was appropriately numbered, identifying it for installation as wainscotting in such a manner that the "veining of the marble" would match; and that all of the merchandise was actually used, according to the specifications therefor, for the particular purpose for which it was ordered. That this merchandise might be, or could be, used for some other purpose is mere conjecture, and, therefore, wholly immaterial toward a proper disposition of the issue herein. A possible use of this merchandise has no bearing on its tariff classification.

Plaintiffs' uncontradicted testimony establishes that the merchandise, as imported, was more than slabs, and that it was in, fact, [sic] marble wainscotting, advanced to such condition as to bring it within the provisions of paragraph 232 (d) of the Tariff Act of 1930, as modified by T. D. 51802, as classified by the collector.

The protest should be overruled and the decision of the collector affirmed.

Chief Judge Oliver's dissent is clearly supported by the following testimony of Mr. Moreno Tedeschi, set out below, given in behalf of the importer.

Q. Would you mind telling us what came in under that invoice in the 21 cases?
A. In the 21 cases came in marble wainscott.
Q. What thickness?
A. ⅞ inch thickness.
Q. And in what shape was the merchandise?
A. Cut up in slabs.

\*     \*     \*     \*     \*     \*     \*

Chief Judge Oliver: The slabs referred to on that invoice in the condition in which they were imported, were they cut to blueprint specification short and long and a certain number of pieces, to fit a certain specified blueprint?

The Witness: Yes, they are cut to blueprint specifications, but they never actually fit actual conditions of the building.

\*     \*     \*     \*     \*     \*     \*

Q. Where did you obtain your measurements that you used for your order?

A. At the church, at the building.

Q. Did you measure the building?

A. Yes.

Q. Did you measure the building to give the exact size of the slabs?

A. Yes, but they never comply for some reason or other.

Q. For this particular job, you stated that you drew up the measurements for the order of the slabs that you imported in this particular invoice?

A. Yes.

\*      \*      \*      \*      \*      \*      \*

Q. Can you tell the court just what had to be done after importation to place these slabs into the wall as a wainscotting?

A. You start with the base, and 90 out of 100 the floor is out of level, and so you have—

Chief Judge Oliver: When you got there, the floor was not level?

The Witness: That is right.

Chief Judge Oliver: Then you do what; you cut the marble to fit the floor?

The Witness: Yes, and to bring it up to level.   On top of that base, we put the slabs, 3 feet, or a foot and 6 inches, whatever is called for, put them on top of that base.   When we get to the corner, then we have to fit and cut them.

\*      \*      \*      \*      \*      \*      \*

Q. Can you use the holes on the top edge as such in the condition as imported?

A. No, they are never deep enough.   They are never adjusted to the conditions on the wall.

Q. In placing these slabs, the 5½ inch slabs to the wall, did you have to do any cutting on this job?

A. Yes.

Q. What sort of cutting?

A. It is a fitting cutting.   It is a cutting that is done because the building may not be perfect as far as the length of the wall is concerned.   The marble setter is human and he may leave more joints than he is supposed to, and when we get at the end of the corner, where we are supposed to turn around, that slab must be cut and fitted.

\*      \*      \*      \*      \*      \*      \*

XQ. You say you ordered these according to specification?

A. That is right.

XQ. You yourself did?

A. That is right.

XQ. And were they ordered for this particular job?

A. Yes.

XQ. And the order designating the number of pieces and the size, that is the length, width and thickness, was in accordance with this specific job?

A. That is right.

XQ. Were these pieces used exclusively on this particular job?

A. Yes.

XQ. Were these pieces numbered?

A. Yes.

XQ. And what is the object in having them numbered?
A. The object is just to follow up the vein of the marble.
XQ. So they were intended to be fit into a specific place in your plan?
A. They are intended, when the job is finished, to be a pleasing looking job, so all the veining of the marble is supposed to match.

The majority opinion states the issue here involved as follows:

* * * Therefore, the issue is simply whether, *at the time of importation*, it had been sufficiently advanced in condition as to be partly manufactured into wainscotting.  * * *

The above-quoted testimony shows clearly that the merchandise was "marble wainscott"; that the order designating the number of pieces and the size, that is the length, width and thickness, was in accordance with this specific job; that the specifications were obtained by measuring the building in order to get the exact size of the marble pieces needed and that the marble was cut to the blueprint specifications, short and long, into a specified number of pieces, to fit the specified blueprint; that the cutting which was required was "a fitting cutting" that was "done because the building may not be perfect as far as the length of the wall is concerned," and because the "marble setter is human and he may leave more joints than he is supposed to." Also, each piece of the merchandise was highly polished on one side and holes were drilled into one edge of each piece to be used with anchors, or clamps, or fastening devices to hold the pieces to the wall.

The testimony further clearly shows that each piece of the wainscotting was numbered so as to identify its exact place in the wainscotting pattern.

The testimony also shows that the importer generally imports 10 per cent more material than is needed and in the instant case ordered 10 per cent more than was needed. This is apparently done so as to provide sufficient material to take care of the uneven floors and the joints which the witness testified the marble setter may leave and to take care of any breakage. The fact that the excess marble was left at the building so that "in case there is some damage later, they have the marble to use it," indicates that it is wainscotting for this particular job and not valuable to the importer for any other purpose.

The cited case of *Thompson-Starrett Co.* v. *United States*, 12 Ct. Cust. Appls. 37, T. D. 39979, is distinguishable from the case at bar. In that case the tiles in question were stock tiles, and they were not cut to particular dimensions, nor did they have a specific use as a whole instead of separately.

Also distinguishable is the cited case of *United States* v. *McBride Studios*, 14 Ct. Cust. Appls. 321, T. D. 41956. In that case tile was imported for the purpose of replacing damaged tile in a floor. In the case at bar the pieces of marble were designed for the construction of a particular entire wainscotting and were numbered for use in accord

with that design and when assembled made an entirety; an article ready for use, to wit: a wainscotting.

The cases of *Kronfeld, Saunders & Co.* v. *United States*, T. D. 26366, 9 Treas. Dec. 849, and *U. Luisi & Co.* v. *United States*, T. D. 49180, 72 Treas. Dec. 362, are in point here and present, I feel, correct applications of the law. In the *Kronfeld, Saunders & Co.* case it was held that pieces of marble, cut to size and rubbed and polished, which were ordered and designed for, and which when fitted together constituted a particular floor upon which a baptismal font was to be erected, were in fact an entirety, and as such not dutiable as marble slabs or tile (Tariff Act of 1897), but properly dutiable as marble manufactured into articles.

In the *U. Luisi & Co.* case the court stated:

With respect to the inlaid units it is not disputed that as imported the entire quantity was intended to be used as a border around the sanctuary wainscoting of a church in Cleveland. There does not seem to be any question but that the various pieces constituting the border were designed, cut, and assembled with the purpose of being used as a border for the particular sanctuary for which they were ordered and later installed.

The court held the border to be a complete article in knocked-down condition and that it was properly classifiable for duty purposes under the provision in paragraph 232 (d) of the Tariff Act of 1930 for articles of which the component material of chief value is marble.

I do not find evidence to support the conclusion of the majority that the imported merchandise has "general utility." It is of no consequence that the imported pieces of wainscotting "could have been" or "might have been" used for some other purpose. There are very few, if any, articles that "could" not or "might " not be used for more than one purpose.

The recent case of *Atlas Export Co., F. L. Kraemer & Co.* v. *United States*, 43 C. C. P. A. (Customs) 122, C. A. D. 618, is in point here. In that case the merchandise was described as "certain square and circular pieces of onyx that are polished on one flat side and on all the edges. All of the pieces in question are approximately seven-eighths of 1 inch in thickness, and either 3½, 6 or 8 inches square, or 5, 6, or 8 inches in diameter. Each piece has a hole drilled in the center." The merchandise was assessed with duty under the provisions of paragraph 232 (d) of the Tariff Act of 1930.

In affirming the decision of the Customs Court we unanimously held that it was not essential that the imported merchandise be dedicated to the manufacture of any specific article or class of articles to be "partly manufactured" for tariff purposes, but that it was sufficient that it shall have been processed to a point where it has a distinctive character different from that possessed by the original material.

It is clear that the merchandise here involved does not meet our definition of a "slab" as set out in our recent decision in the *Atlas*

case, *supra*. It is also clear that the involved merchandise has been "processed or manipulated" and that for tariff purposes it is at least partly manufactured.

The majority appears to rely on the case of *Worthington* v. *Robbins*, 139 U. S. 337 (1891). That case was decided in 1891 under wholly different tariff laws and under a state of facts wholly different from the facts in the case at bar.

In the *Worthington* case a product known and described in the trade as "white hard enamel" was correctly held not to be "watch materials" not specially enumerated or provided for in the then pertinent tariff law.

In that case it was agreed "that the merchandise is and was in 1883 known and described in trade as 'white hard enamel'; that it is used for various purposes, including the making of faces or surfaces of watch dials, scale columns of thermometers, faces or surfaces of steam-gauge dials, and for other purposes when a smooth or enamelled surface is desired"; that "the form or condition of this merchandise, as imported, affords no evidence or indication of the use to which it is to be applied"; that the merchandise involved "in the form or condition as imported, cannot be used for any of the purposes above described, nor for any purposes whatever of practical use to which it is adapted or ever applied; that before it can be applied to any practical use its present form and condition must be changed by grinding or pulverizing, and new processes of manufacture applied."

In that case the court stated:

\* \* \* In order to be dutiable as "watch materials," the article, when imported, must be in such form of manufacture as to show its adaptation to the making of watches.

\* \* \* In order to be "watch materials," the article must in itself bear marks of its special adaptation for use in making watches. \* \* \*

The *Worthington* case supports this dissent.

The uncontradicted testimony as above set out shows the imported merchandise was specially ordered for wainscotting, for a particular job, according to the importer's specification; that it was cut to size according to the blueprint furnished by the importer; that each piece was numbered so as to fit into its proper place in the wainscotting; that two holes were drilled in each piece for the purpose of clamping it to the wall and that the merchandise was ordered for the single purpose of being used as wainscotting in a particular building and that it was so used. It is abundantly clear that the instant merchandise is in such form of manufacture as to show its adaptation to use as wainscotting.

For the foregoing reasons, I am of the opinion that the judgment of the Customs Court should be reversed.